IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 26, 2003

## CHARLES W. COLE v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Carter County**
**No. S15355     Lynn W. Brown, Judge**

_____

**No. E2002-02535-CCA-R3-PC**
**August 29, 2003**
_____

The petitioner, Charles W. Cole, pled guilty on February 4, 2000, to five sexual offenses and, in January 2001, filed a petition for post-conviction relief, asserting that his trial counsel was ineffective. Following a hearing, the post-conviction court dismissed the petition, and the petitioner timely appealed. We affirm the dismissal of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and JOHN EVERETT WILLIAMS, JJ., joined.

H. Randolph Fallin, Mountain City, Tennessee, for the appellant, Charles W. Cole.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Joe C. Crumley, Jr., District Attorney General; and Kenneth C. Baldwin, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

Little information is contained in the record on appeal as to the offenses to which the petitioner entered pleas of guilty. The post-conviction court stated that the petitioner had received ten-year sentences for each of his convictions, with two of the sentences to be served consecutively. While it appears that the pleas of guilty were to two counts of aggravated sexual battery and three counts of child rape, the latter three pleas may have been to rape.

The first witness at the June 3, 2002, post-conviction hearing was the petitioner's daughter, Lisa Parlier, who said that the petitioner could not read or write. She said that the petitioner was living with her in North Carolina at the time he learned of the charges. She subsequently brought the petitioner to meet with Investigator Randy Bowers at the Carter County Sheriff's Department. At this meeting, she asked if the petitioner needed a lawyer, and Bowers responded, "No, we're just

going to talk to him." Bowers then "took [the petitioner] back to the back," and, after about an hour and a half, he and the petitioner returned. Bowers informed Parlier that the petitioner had confessed to sexual assault. The petitioner was allowed to leave at that time, but, a week or two later, she received a telephone call from a law enforcement officer who asked her to bring the petitioner back to Carter County. She did so; the petitioner was arrested; and counsel was appointed. Both Bowers and the petitioner's trial counsel offered to let Parlier watch the videotape of her father's confession to Bowers, but she declined to do so.

On cross-examination, Parlier said that the petitioner is married to her mother and had worked for State Line Coal Yard and Estep Coal Company for twenty-four years, driving a truck and working in the yard. She said that the petitioner liked to watch television and work on cars. To her knowledge, the petitioner had not had any mental health problems or visited a mental health facility. However, he apparently was suffering from black lung disease. The petitioner had obtained a driver's license through an oral test. She said she did not know if the petitioner understood the word "molest," but it could be explained to him "[i]f you used the right words." The petitioner met with trial counsel "between four and five times," and she had accompanied him on two of those occasions.

Kathy Parlier, another daughter of the petitioner, testified that she was living with the petitioner in Hampton "when the incident supposedly happened." He later moved to North Carolina. On the day the petitioner met with Investigator Bowers, she heard her sister, Lisa, ask Bowers if the petitioner needed a lawyer and Bowers replied that he did not. She was also present during one of the petitioner's meetings with trial counsel, at which time counsel informed them that there was "nothing he could do."

The sixty-eight-year-old petitioner testified that he had a second grade education and could not read or write. He said that he suffers from "a lung problem" and emphysema. At the age of eighteen, he obtained a driver's license by taking an oral test and began working for a coal company delivering coal. When questioned by the post-conviction court about the prices of coal and how he collected the money for the coal he delivered, the petitioner said that he "can count money" and "can figure . . . some things I have to figure with a pencil and paper . . . [a]nd some things . . . I can figure it in my head . . . [T]hey can't cheat me out of money. I know that."

The petitioner further testified that he was living with his daughter, Lisa Parlier, in Granite Falls, North Carolina, when Investigator Bowers first contacted him. His daughter brought him to Carter County to meet with Bowers who first told him that he did not need a lawyer and then advised him that he "had a right to remain silent and a lawyer." The petitioner acknowledged that Bowers had read his rights to him and that he initialed the paper although he did not understand "half of it cause I wasn't interested . . . in it because I didn't know what it was." The petitioner did not inform Bowers that he did not understand his rights because he did not think it was important or that he would "get railroaded." Bowers told the petitioner that he "probably wouldn't go to court," but if the case did go to court, he would "get probation." His interview with Bowers lasted approximately two hours and he was allowed to leave at the conclusion of the interview.

The petitioner said that trial counsel was appointed to represent him after his arrest and that he met with counsel three times. He told counsel about the videotape of his confession but did not tell counsel not to show it to his family. Trial counsel told him that if his case went to court, "he couldn't win it." The petitioner said he and trial counsel never discussed "any way to get rid of the statement," and he never told counsel not to file a motion to suppress the statement. He gave counsel permission to discuss his statement with his daughters. He acknowledged that he knew that his videotaped statement was "heavy evidence" against him. He said that his complaint was that trial counsel did not file a motion to get rid of his statement and "didn't do what I thought he ought to do." The petitioner said that he did not know the meaning of the word "suppress" and that he had relied entirely upon trial counsel to help him.

Investigator Randy Bowers testified that he interviewed the petitioner on October 19, 1999. Neither the petitioner nor his daughter who had accompanied him asked Bowers if the petitioner needed an attorney. Bowers said that if an interviewee asked him if an attorney was needed, his practice was to tell the interviewee that he had the right to an attorney, and he would not tell an interviewee that he did not need an attorney. At the beginning of the petitioner's interview, Bowers read the Miranda rights to him even though he was not in custody. Bowers did not recall the petitioner saying anything about whether he could read or write. He read the petitioner his rights, asking him after each sentence if he understood, and the petitioner acknowledged each time that he did. Bowers denied making any promises to the petitioner or telling him he would get probation.

When Investigator Bowers asked the petitioner what had happened between him and the victim, the petitioner told him the "entire story." Bowers then put in a videotape and "went back over" the petitioner's story with him to "make sure that we were clear on it." Subsequently, he made a copy of the videotape which he gave to trial counsel.

Trial counsel, an assistant public defender since 1989, testified that he was appointed to represent the petitioner and met with him "several, more than two or three" times. Trial counsel obtained statements of the victim's version of the incident, as well as a copy of the petitioner's videotaped statement. Counsel made notes as he watched the tape and was allowed to read portions of his notes during his testimony. The petitioner told trial counsel that his rights had been read to him twice on the day of his interview and that no promises or threats had been made to him, but he had been "tricked" by the investigators. Neither the petitioner nor any of his family told trial counsel that they had asked Investigator Bowers if the petitioner needed an attorney. Because of the petitioner's health problems, counsel had a mental evaluation performed on the petitioner "which came back that he understood what he was doing. He was competent and no insanity defense could be supported."

Trial counsel was satisfied that the petitioner "understood the mechanics of the motion to suppress and how that would work in terms of procedure." Although trial counsel's normal practice "in a case of this magnitude" was to file a motion to suppress, he did not do so after discussing it with the petitioner "[m]any times" because the petitioner did not want his family, a jury, or a judge to see the videotape of his statement. Further, the petitioner never authorized him to show the tape

to anyone. Trial counsel explained that the videotape was "extremely damning in that looking at it objectively you might get the sense that [the petitioner] was sort of trying to put it on the [victim], trying to say, I wasn't really doing anything, it was her idea . . . she reached up my pants leg." The petitioner did not want the videotape played unless counsel "could assure him that [they] would win either the motion or the trial." Because counsel could not assure him that they would be successful, he did not file a motion to suppress the statement. The petitioner ultimately decided to take the State's plea offer of twenty years. Trial counsel said that he had no reservation about the petitioner's "competence to stand trial or his ability to understand the consequences of a guilty plea."

At the conclusion of the hearing, the post-conviction court made the following findings of fact and conclusions of law:

> The court credits testimony of Mr. Bowers and [trial counsel]. And to the extent there are conflicts in the testimony of [the petitioner] and his two daughters, the court does not place credibility in what they say. For one thing, [the petitioner] says that he was promised that he would not get much time, that probation was mentioned. [Trial counsel's] testimony is very clear and positive that he went over, Were there any promises made, were there any threats? All that was investigated, and at the time [the petitioner] said no, that the primary thing that was driving [the petitioner] was for his family to avoid seeing this videotape. . . . And [the petitioner] was so embarrassed by what he had said that he refused to give his lawyer . . . even permission to talk to his family for the first bit of it. And the finding is that there were no threats, that were no promises made. . . . The court finds that [trial counsel] was instructed to avoid playing the videotape in court, and by doing so and following his client's wishes, that . . . prevented an effective motion to suppress.
>
> . . . .
>
> [A] motion to suppress would have been futile. If one had been filed, it would have been overruled by this court without a doubt. Therefore, the final conclusion is that no constitutional deprivation occurred. [The petitioner] was accorded all of his rights. There's no indication that counsel was other than effective in this case.

Although the post-conviction court instructed post-conviction counsel to prepare written findings of fact and conclusions of law, they are not included in the record before this court.

## I. Analysis

The petitioner argues that trial counsel was ineffective for not filing a motion to suppress his videotaped statement, saying that because of his limited intellect, counsel "should have erred on the side of caution and file[d] a Motion in raising the issue of voluntariness."

-4-

In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

By statute in Tennessee, the petitioner at a post-conviction relief hearing has the burden of proving the allegations of fact by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f) (1997). A petition based on ineffective assistance of counsel is a single ground for relief, therefore all factual allegations must be presented in one claim. See Tenn. Code Ann. § 40-30-206(d) (1997).

We note that when post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the trial judge's findings of fact and conclusions of law are given the effect and weight of a jury verdict, and this court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999), "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

We have viewed the approximately thirty-minute videotape of the petitioner's statement regarding the allegations against him. At the beginning of the videotape, Investigator Bowers entered the room where the petitioner was seated in a chair and handed him cups of water which, apparently, the petitioner had requested. The petitioner then agreed with Bowers' statement that they earlier had been talking, the petitioner had been advised of and understood his rights, and wished to give his version of what had happened. The questioning was conversational in tone, nonthreatening, and the petitioner gave responses which were appropriate to the questions. Often, the responses consisted of several sentences. The petitioner's limited education was not at all apparent from his responses to the questions. At the end of the session, he agreed that he had told the truth, but "didn't know what was going to happen to [him], though."

We conclude that the record on appeal fully supports the findings of the post-conviction court that Investigator Bowers had advised the petitioner of his Miranda rights, who then had voluntarily given his statement. Likewise, the record supports the post-conviction court's determination that, since a motion to suppress the statement would have been without merit, the petitioner failed to prove that he had been prejudiced by the alleged ineffective representation of counsel.

### III. Conclusion

We affirm the post-conviction court's dismissal of the petition.

_____
ROBERT W. WEDEMEYER, JUDGE